**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-80173-CR-CANNON**

**UNITED STATES OF AMERICA**

**vs.**

**GREGORY MALCOLM GOOD,**

      **Defendant.**

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO**
**DEFENDANT GOOD'S MOTION FOR A DOWNWARD VARIANCE**

**COMES NOW**, the United States of America, by and through its undersigned attorneys, and respectfully submits this sentencing memorandum and response to defendant Gregory Malcolm Good's motion for a downward variance. [ECF No. 179].

Crimes involving the sexual abuse of children are incalculably serious. Offenders who traffic in child pornography inflict grave, lifelong trauma on their victims.  And far too often, these victims go unidentified, meaning their suffering goes unvoiced.  As one court put it,

> [c]hild pornography is a vile, heinous crime.  Mention the term to your average American and he responds with immediate disgust and a sense of unease.  However, once it enters the legal system, child pornography undergoes sterilization.  The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense.  Victims all too often remain nameless.  The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010).

The defendant helped run a website on which thousands of users trafficked in countless images and videos depicting the sexual exploitation, abuse, and even torture of such victims.  This is an exceptionally serious case.  The government therefore respectfully recommends that the Court sentence the defendant to a within-Guidelines term of imprisonment of 330 months.

## **BACKGROUND**

The defendant is before this Court for sentencing after pleading guilty to conspiring to advertise and distribute child pornography.  Unlike many child-pornography offenders, including many discussed in the defendant's sentencing brief, the defendant's offense conduct is not limited to isolated incidents of downloading child sexual abuse material ("CSAM") from the internet, or even distributing it.  Instead, he was convicted because of his deep involvement with "Website A," which was a private community on the dark web where pedophiles came together to discuss and share material depicting the sexual abuse of infants and toddlers, violent and sadistic CSAM, and other illegal material.  For years, this site provided a large and active community for offenders from around the world to explore their shared sexual interest in children.  In this sense, Website A was a sanctuary for this type of offender, with users constantly validating each other's conduct, sharing tips on how to avoid detection, and emboldening each other to escalate their behavior.

This international criminal enterprise was made possible a dedicated group of staff—select users with elevated status based on their active participation and sharing of CSAM—who voluntarily worked around the clock to screen new users for membership, promulgate and enforce rules on sharing CSAM, and encourage and monitor other users' advertisement of CSAM.

The defendant, Gregory Good, was one of these staff members.  Over the course of nearly two years, he continuously accessed Website A, rose through the ranks to become one of the 10 or 12 highest-ranking staff members, and worked to manage and moderate the website.  He advised other users on how to share CSAM over Website A, and he also posted images and videos depicting the rape and abuse of prepubescent children.  His involvement with Website A ended only when the FBI detected his behavior, executed a search warrant at his home, and arrested him.

A federal grand jury charged the defendant with conspiracy to advertise and conspiracy to

2

Case 9:22-cr-80173-AMC   Document 192   Entered on FLSD Docket 08/17/2023   Page 3 of 22

distribute child pornography, in violation of 18 U.S.C. §§ 2251(d) and (e), and 2252A(a)(2) and (b)(1).  [ECF No. 38].  He pleaded guilty to both counts without a plea agreement.  [ECF No. 135].

Given the severity of the defendant's conduct and his enhanced role in developing and tending to this community of child sex offenders, the United States opposes the defendant's request for a downward variance or departure and submits that a within-Guidelines sentence of 330 months is lawful, just, and appropriate.  As explained below, this sentence is particularly appropriate in light of the Court's 280-month sentence for a less culpable codefendant, Robert Boyles.

## SENTENCING ANALYSIS

"In sentencing a defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.'" 18 U.S.C. § 3553(a)(4)(A). The Sentencing Guidelines are thus the appropriate starting point from which the Court exercises its discretion under § 3553(a). *See United States v. Crawford*, 407 F.3d 1174, 1178–79 (11th Cir. 2005). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

## I.     THE APPLICABLE SENTENCING GUIDELINES

The U.S. Probation Office filed a final presentence investigation report containing the following Guidelines calculation:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(2)); | 22 |
| Enhancement for trafficking in material that involved a prepubescent minor and a minor who had not attained the age of 12 years (*id.* § 2G2.2(b)(2)); | +2 |
| Enhancement for distributing in exchange for non-pecuniary | |

3

| | |
|---|---|
| consideration (*id.* § 2G2.2(b)(3)(B)); | +5 |
| Enhancement for trafficking in material that portrays masochistic conduct or other depictions of violence or sexual abuse of exploitation of an infant or toddler (*id.* § 2G2.2(b)(4)); | +4 |
| Enhancement for use of a computer or interactive computer service for receipt of child pornography (*id.* § 2G2.2(b)(6)); | +2 |
| Enhancement for an offense involving more than 600 images (*id.* § 2G2.2(b)(7)(D)); | +5 |
| Enhancement for being a manager/supervisor of criminal activity involving more than five individuals (*id.* § 3B1.1(b)); | +3 |
| Reduction for demonstration of acceptance of responsibility (*id.* § 3E1.1(a)); | -2 |
| Reduction for timely notification of intent to plead guilty (*id.* § 3E1.1(b)).[1] | -1 |
| **TOTAL:** | **40** |

[ECF No. 181 ("PSR") ¶¶ 92-105]. This calculation is accurate, uncontested, and reflects the facts underlying the defendant's offenses and other relevant conduct. The PSR further categorized the defendant in Criminal History Category I, which results in a Guidelines sentencing range of 292 to 365 months. [*Id.* ¶¶ 108, 158].

The PSR also correctly notes that the defendant is subject to a mandatory minimum term of imprisonment of 15 years, a mandatory minimum term of supervised release of five years, a maximum fine of $250,000 per count of conviction, a special assessment of $100 per count of conviction under 18 U.S.C. § 3013, a potential $5,000 special assessment per count of conviction under 18 U.S.C. § 3014, and an additional special assessment of up to $35,000 per count of conviction under 18 U.S.C. § 2259A. [PSR ¶¶ 157-69]. Finally, the defendant is required under 18 U.S.C. §§ 2259 and 2259A to pay restitution in the full amount of the losses incurred by any victims as a result of his child-pornography-related conduct. [*Id.* ¶ 170].

---

[1] If the Court determines that the defendant has accepted responsibility and is entitled to a two-level reduction under U.S.S.G. § 3E1.1(a), the United States moves to adjust the defendant's offense level downward by one level pursuant to § 3E1.1(b) for timely notifying the government of his intention to plead guilty.

The defendant does not contest the accuracy of these Guidelines calculations, although he argues for a downward departure.  [ECF No. 171].  He also filed a sentencing memorandum requesting a downward variance to the minimum possible sentence of 15 years.  [ECF No. 179].

A.    **Policy Statements in the Guidelines Do Not Permit a Downward Departure**

The policy statements set forth in the Guidelines Manual do not permit a downward departure based on any of the criteria that the defendant lists in his objections to the PSR.  He relies on policy statements regarding age (§ 5H1.1), mental and emotional conditions (§ 5H1.3), and military service (§ 5H1.11).  [ECF No. 171 at 2-3.]  But the Guidelines contain a policy statement set forth in U.S.S.G. § 5K2.0(b), which makes clear that "child crimes and sexual offenses"— which include the offenses under Chapter 110 of Title 18 to which the defendant pleaded guilty— are to be treated differently than other types of crimes.  U.S.S.G. § 5K2.0(b) & App. Note 4(A).  In such cases, the only permissible bases for a downward departure are those "expressly enumerated" in Chapter Five, Part K of the Guidelines Manual.

Even if there were a sufficient basis for a departure under the provisions that the defendant cites—and there is not—all of these provisions are located in Part H of Chapter 5 and are absent from Part K.  Accordingly, they are not permitted bases for a downward departure.  *See United States v. Reilly*, 662 F.3d 754, 758-59 (6th Cir. 2011) ("Neither a defendant's lack of prior criminal history nor his or her military service are enumerated in § 5K.  Accordingly, although these considerations are permissible grounds of departure for other types of crimes, these two factors are specifically excluded from consideration for child crimes and sexual offenses.").

The only policy statement from Part K that defendant cites is, on its face, entirely inapplicable.  He asserts that he should receive a departure under U.S.S.G. § 5K2.0(a)(3) for various reasons.  [ECF No. 171 at 3-4.]  But this provision falls within a section that pertains only

to "Upward Departures in General and Downward Departures in Criminal Cases *Other Than Child Crimes and Sexual Offenses*."  U.S.S.G. § 5K2.0(a) (emphasis added).  The defendant is obviously not entitled to a departure under a policy statement that expressly excludes the type of crime for which he is being prosecuted.

### B.    The Guidelines Range Possibly Understates the Defendant's Culpability

The Sentencing Guidelines do not include an enhancement for the most central and reproachable aspect of the defendant's criminal offense: his participation in and leadership of an online community of CSAM offenders.  His Guidelines could thus even *understate* his culpability.

This idea is endorsed by the Sentencing Commission.  In its 2012 Report to Congress, the Commission identified "the degree of an offender's involvement with other offenders—in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation"—as one of the "primary factors that should be considered in imposing sentences in §2G2.2 cases."  United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at xvii-xviii (December 2012) ("2012 Report").[2]

The Commission concluded that such communities "allow child pornography offenders to connect with one another, commiserate about their marginalized status in society, and validate and normalize their sexual interest in children."  2012 Report at 92.  While not every member of a child exploitation community has engaged in hands-on sex offenses against children, it found that the existence of such communities "increases the likelihood that *other* community members may engage in sex offending to create new child pornography images for trading online."  2012 Report at 94 (emphasis in original).  The Commission found that such communities are also dangerous

---

[2] The full report is available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last visited August 17, 2023).

because they normalize the sexual exploitation of children, help offenders look at their deviant sexual desires in a positive light, and may lead offenders to progressing from viewing CSAM to committing other sex offenses. *Id.* at 97.

For these reasons, the 2012 Report suggested that not accounting for CSAM communities could result in "***unduly lenient*** ranges for other offenders … who were involved in child pornography communities…" *Id.* at 321 (emphasis added). Being a leader and facilitator of a CSAM community, of course, is much more aggravating than merely participating in one.

## II.    THE 18 U.S.C. § 3553(A) FACTORS WARRANT A 330-MONTH SENTENCE

In this case, there are no factors that warrant a variance or departure from the Guidelines range. Despite his exceedingly serious criminal conduct, the defendant seeks the minimum possible sentence, which grossly underserves the purposes of 18 U.S.C. § 3553(a). In particular, § 3553(a)(1) provides that courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant in crafting a sentence. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. Section 3553(a) also instructs courts to consider the need to avoid sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6). Careful consideration of these factors confirms that a within-Guidelines sentence of 330 months is sufficient but not greater than necessary to achieve the purposes set forth in § 3553(a).

### A.    The Nature and Circumstances of the Offenses

The final PSR provides a thorough overview of Website A and the conduct of the defendant and his co-conspirators. [PSR ¶¶ 4-82]. In short, Website A was a sprawling and complex criminal

enterprise catering to pedophiles and enthusiasts of images and videos depicting the rape, abuse, and exploitation of minors.  Users of the website—of which there were thousands—trafficked in large volumes of CSAM and discussed the sexual abuse of minors for years.  [*Id.* ¶¶ 4, 16].  This was by design: the staff members who ran the site required other users to share CSAM and participate in conversations in order to become members and gain greater access to the site.

But Website A was more than just a website or a place to acquire CSAM.  It was a flourishing community where offenders could come together, discuss their interests, share information, provide advice on how to avoid law enforcement, and normalize one another's sexual desire for young children.  Offenders who gravitate to these sort of communities—as opposed to those who obtain their CSAM through more impersonal methods, like peer-to-peer file-sharing software—are far more dangerous because it is in these online communities where offenders validate their sexual interest in children "so that actual sexual contact with a child no longer seems as wrong," which reduces the stigma that prevents many offenders from moving from trafficking or possession of CSAM to more serious sexual conduct with children.  *United States v. Klear*, 3 F. Supp. 3d 1298, 1304 (M.D. Ala. 2014).  And, to make matters worse, the technology underlying Website A was designed to allow these offenders to engage in these activities anonymously but openly, and with a measure of assurance that their crimes would not be detected.  [PSR ¶ 5].

All of this was possible because of the dedicated work of the defendant and the other staff members of Website A, who facilitated CSAM offenses on a massive, global scale.  The defendant rose through the ranks of Website A until he had privileges of participating in staff meetings that were restricted to approximately 10-12 of the highest-ranking members of the website.

By achieving this status, the defendant was more central to the functioning of Website A than his co-defendants Robert Boyles or Matthew Garrell, both of whom were moderators who

helped moderate rooms on Website A but who had not achieved enough status to participate in staff meetings.  [*See* PSR ¶¶ 64, 71].  In contrast, the defendant was not as high ranking as William Spearman or Selwyn Rosenstein—the first- and second-highest ranking members of Website A, respectively.  [*Id.* ¶¶ 17, 38(f), 41].

As a high-ranking staff member of Website A, the defendant contributed significantly to the day-to-day functioning and operations of the website.  He provided guidance to other users, recruited lower-ranking staff members such as moderators, recommended users for promotions, and even financially contributed to the operations of the website.  [PSR ¶¶ 32, 38-39].  He told the FBI that he "loved" moderating the publicly available room on Website A and accessed the website on a nearly daily basis.  [*Id.* ¶ 38(c)].

The defendant did not just help create an environment that allowed others to distribute and consume CSAM.  He enthusiastically did so himself.  He repeatedly shared depictions of children being raped and exploited, and he posted videos with vile descriptions that reveal his delight in the graphic sexual abuse of prepubescent children.  For example:

- He shared a video with the message "[n]ice 6yo pussy fucks close ups."  "yo" is an abbreviation for "years old."  The video depicted an adult man molesting and ejaculating on a prepubescent girl.  [PSR ¶ 33(a)].

- He shared a video with the description that a "pt" girl—short for "preteen"—was engaged "in amazing action with dad."  The video likewise depicts an adult man inserting his penis into a prepubescent girl's mouth and vagina and his fingers into her vagina and anus.

- He shared a video in which he commented that a prepubescent girl between the ages of seven and nine has "such a great ass."  [*Id.* ¶ 33(c)].

- He made a post describing a video as depicting a "forced deep throat" with a preteen girl who was "tied."  [*Id.* ¶ 34].

- He made another post promoting content that depicted a "cute little 4yo in training" who "tak[es] dildo and dad's cock."  [*Id.*]

- Yet another of the defendant's posts described content as depicting a "PedoDad

fucking his beautiful young preteen daughter." [*Id.*]

He admitted that he posted at least one gigabyte of CSAM to Website A and was rewarded with admission into a room that contained an enormous quantity of additional CSAM. [*Id.* ¶ 38(e)].

The defendant continued assisting with Website A and sharing and consuming CSAM even after being caught and confronted by his now-deceased wife. [PSR ¶ 38(j)]. In fact, when his wife of more than 50 years suddenly passed away in her sleep, the defendant logged into Website A the very next day to tell his co-conspirators about his loss. [*Id.* ¶ 37].

This demonstrates that the defendant was not a casual, tepid, or conflicted participant in this criminal enterprise. Instead, he fully committed himself to Website A, rose through the ranks to the upper echelon of members who oversaw the thousands of lower-level users on the site, and spent significant amounts of time ensuring that the website functioned properly and that others followed the rules. This was not a crime of opportunity or the result of a momentary lapse of judgment. Instead, the defendant's crimes took sustained planning, effort, and time.

The defendant's conduct makes clear that he dedicated himself to Website A because he harbors a deep interest in depictions of children being sexually assaulted. In addition to his conduct on Website A, the defendant accessed at least *six* other dark web websites dedicated to child pornography and he maintained thousands of CSAM images and videos on his personal devices. [PSR ¶¶ 38(h), 39(a)]. His collection included depictions of infants, toddlers, bestiality, bondage, and sadism. [*Id.*] And the defendant was not interested only in images of adults molesting children; he also enjoyed reading stories of children being sexually abused by adults. [*Id.* ¶ 38(i)].

Although this Court must consider other factors beyond the defendant's offense conduct, this Court should nonetheless give significant weight to his activity on Website A at sentencing. *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court.").

B.      **The History and Characteristics of the Defendant**

The defendant's history and characteristics also weigh strongly in favor of a within-Guidelines sentence of 330 months.  He has no criminal convictions, but to suggest that he has no criminal "history" misses the mark.  [PSR ¶¶ 106-07].  He was active on Website A for nearly two full years, and he admitted to logging on daily.  [*Id.* ¶¶ 32, 38(g).]  While he was active on Website A, the defendant engaged in continuous criminal conduct for a prolonged period of time. The operation of Website A required constant monitoring of user activity, which the defendant gladly provided in his role as a high-ranking staff member.

Nor was the defendant's activity on Website A likely his first foray into the world of child exploitation.  He admitted to first accessing the dark web and websites dedicated to CSAM in December 2020.  [PSR ¶ 38(g)].  But it is exceedingly difficult to for a user to stumble upon a dark web website such as Website A unintentionally. *See United States v. Taylor*, 935 F.3d 1279, 1283 (11th Cir. 2019) ("You can't just Google a hidden service; rather, a user can access one of these Tor-specific sites only by knowing its exact URL address.").  Sites like Website A are therefore usually "shared via message-board postings on the regular internet or by word of mouth" among those familiar with them.  *Id.*  In other words, the defendant—like his co-defendants—is a savvy, experienced, and eager consumer of CSAM.

The Court should also conclude that the defendant was motivated to commit these offenses by his sexual attraction to prepubescent children.  He offers no coherent, non-pedophilic explanation for his crimes.  He appears to try to blame his decision to help run a child sexual exploitation community on depression he suffered after moving to Nevada and being away from his family.  [ECF No. 179 at 3-4.]  Depression, of course, is an extremely common affliction. There is no reason to believe that those who suffer from it are compelled to help run CSAM

11

websites or consume videos depicting child rape. And defendant began offending months hab0rbefore his wife passed and he lived alone in Nevada. [PSR ¶ 38(j)].

The most likely—and, in fact, only conceivable—explanation for the defendant's conduct is that he harbors a pervasive sexual interest in children. This is of particular concern given that there is reason to believe the defendant is more savvy and thus less likely to be caught in the future than the average CSAM offender. As outlined above, he is an experienced consumer of CSAM, which he parlayed into a leadership role on Website A. He understood the importance of using the dark web as a means to avoid detection. He is therefore far more capable than an average offender of continuing to commit online CSAM offenses without detection.

The defendant, for his part, asks this Court to consider his service to the military, his community, and his family. [ECF Nos. 179 at 5; 171 at 3.] These aspects of his life are admirable but they do not outweigh the significant aggravating factors in this case. To the contrary, they make the defendant's conduct all the more alarming and incomprehensible. By all accounts, while he helped run Website A, he enjoyed a comfortable home, retirement and social security benefits earned from a long career, the love and support of his sons and late wife. [PSR ¶¶ 117-20, 145-48.] He described his childhood as "good" despite his strict and abusive mother. [*Id.* ¶ 115.] He was not compelled through unfortunate life circumstances to seek out and contribute to the operation of Website A. He did so of his own volition.

He also knew that what he was doing was illegal. [PSR ¶ 38(k)]. He could have simply stopped at any time. But he did it anyway. And he did not stop until he was caught and arrested. [*See id.* ¶ 38(d) (defendant admitted to FBI that he last accessed Website A the night before his arrest)]. The defendant voluntarily and intentionally chose his path, and his sentence should reflect this.

**C.**     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

It is beyond dispute that crimes involving the trafficking of CSAM are serious and warrant significant sanctions.  As "[l]ong-term studies" have confirmed, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority).  The fact that the defendant's conduct of conviction does not involve him committing hands-on acts of child sexual abuse does not lessen the significance of his predatory and criminal behavior.

The defendant claims that when he consumed videos of prepubescent children being sexually abused by adults, he thought he was causing them no harm.  [PSR ¶ 38(k).]  But he was wrong.  Trafficking in child pornography inherently involves the sexual abuse of children, even if no new child pornography is produced. *See New York v. Ferber*, 458 U.S. 747, 759 (1982).  In fact, as explained above, the defendant's community-building activity on Website A here very likely played a role in encouraging other users to escalate from possession to production of CSAM.  Accordingly, far from being victimless, trafficking in child pornography "harms children in part because it drives production [of child pornography], which involves child abuse." *Paroline v. United States*, 572 U.S. 434, 439 (2014).

Trafficking in CSAM also results in perpetual harm to children who have already been sexually abused, all of whom are grappling with the indelible trauma caused by that abuse. *See id.* at 440.  As another court noted, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458

U.S. at 759).  Accordingly, "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse."  Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *see also United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters").  These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm" when offenders consume, receive, and advertise this CSAM.  *Sherman*, 268 F.3d at 547-48.

In light of the very serious harm caused by the defendant's conduct—and the equally serious harm that would befall his victims if he were to recidivate—it is particularly important that this Court craft a sentence that provides just punishment.  18 U.S.C. § 3553(a)(2)(A).  As the Eleventh Circuit has observed, "because punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be.  The seriousness of a crime varies directly with the harm it causes or threatens.  It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime."  *Irey*, 612 F.3d at 1206.  The *Irey* court cited the Senate Report regarding this provision:

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

*Id.* (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).  Put differently,

punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion toward the sexual abuse of children.  *See Gregg v. Georgia*, 428 U.S. 153, 184 n.30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)).  In this sense, retribution is a particularly valid penological goal in a case like this one, where the defendant's crimes caused unfathomable harm to our society's most vulnerable victims.

This Court must also consider the need to "promote respect for the law" at sentencing.  18 U.S.C. § 3353(a)(2)(A).  Congress enacted federal criminal laws targeting CSAM trafficking to address ongoing sexual abuse and victimization of children.  S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43, 56.  But this legislation and its later amendments are more than prophylactic measures. They reflect value judgments and the accepted moral norms of our society.  As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. at 43.

Against this backdrop, the defendant did not just violate federal law, he also transgressed universally recognized moral principles—specifically, the need to protect and nurture children and not to be titillated by depictions of their rape and abuse.  Through his own conduct and the conduct that he facilitated through his moderation and support of Website A, the defendant exploited thousands upon thousands of children and helped to revictimize them through the continued trafficking in material depicting their abuse.  Again, he knew that his conduct was illegal, but he continued doing it.  [PSR ¶ 38(k)].  This Court should craft a sentence that appropriately expresses social condemnation of the defendant's crimes, captures the serious harm he has caused, and

promotes respect for the rule of law.  The government's recommended sentence does all three.

    **D.**    <u>**The Need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public**</u>

Both specific and general deterrence call for a significant sentence consistent with the Guidelines recommendation here.  With respect to specific deterrence, the risk the defendant poses to children is immense.  While he seeks to blame his conduct on depression or living far from his family, this is no explanation for why he plunged himself in the dark world of child sexual abuse websites.  To the contrary, common sense indicates that he was viewing this material because he wanted to do what was depicted in the videos he watched and posted online.  Pornography is by its nature fantasy.  And as the Supreme Court has noted, there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003).  The defendant fits squarely within that class.  The sentence imposed must therefore protect the public and account for the specific danger he poses to minors.

More generally, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'"  *Irey*, 612 F.3d at 1211 (citation omitted).  "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'"  *Id.* (citation omitted). As the Eleventh Circuit explained in a similar case, "[y]oung children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others." *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (quoting *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)).  The same is true here.  And given that "sentences influence behavior," the Eleventh Circuit has concluded that "the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be

produced." *Id.*  For this reason and others, "general deterrence is crucial in the child pornography context." *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012) (quoting *United States v. Camiscone*, 591 F.3d 823, 834 (6th Cir. 2010)) (punctuation altered).

General deterrence is especially important in cases like this, in which offenders use sophisticated technology to evade detection.  Website A operated over a network that was designed to keep its users anonymous and generally undetectable by authorities.  [PSR ¶ 4].  It offered advice on how to further keep "safe" from the prying eyes of law enforcement.  [*Id.* ¶ 13.]  Some of this guidance was expressly directed at protecting offenders who were sexually abusing children and producing videos and images of the abuse.  [*Id.* ¶ 13(e).]  Offenders like the defendant engage freely in criminal conduct while knowing it is wrong, but they do it anyway because they can hide behind the protection of technology.  Countless offenders have escaped detection this way.

In recognition of the value served by general deterrence, the United States submits that a sentence of 330 months is appropriate here.

E.   **The Need to Avoid Unwarranted Sentencing Disparities and the Kinds of Sentences Available**

1.   The United States' recommendation is consistent with sentences already handed down to the defendant's coconspirators

This Court has already sentenced two of the defendant's coconspirators on Website A.  The defendant Selwyn Rosenstein was the second-highest ranking staff member on Website A.  He had a higher status than the defendant, who was in the top 10 or 12 most prominent staff members.  The government recommended a 30-year sentence for Rosenstein, and the Court sentenced him to 28 years, or 336 months.  *See United States v. Rosenstein*, 9:22-cr-80107 (S.D. Fla.), ECF No. 55.

In contrast, the defendant Robert Boyles had a lower status on Website A than the defendant.  His duties and responsibilities were lesser, and he did not have the ability to participate in staff meetings, where the defendant and other upper rungs of Website A staff planned and

discussed the management, operations, and future of the website.  The government recommended a 25-year sentence for Boyles, and the Court sentenced him to 23 years and four months, or 280 months.  [ECF No. 186].

Because the defendant was less culpable for running Website A than Rosenstein but more culpable than Boyles, his sentence should fall between the sentences received by those two coconspirators.  And while it is true that the defendant here had a lesser role in the management of Website A than Rosenstein (and the soon-to-be-sentenced leader of Website A, William Spearman), he still actively sought to gain status and impress Rosenstein, Spearman, and other higher-ranking members by heavily contributing to the site's operation.  Like the higher-ranking defendants, he willingly gave up significant amounts of his free time—time that he could have spent with his family or other pursuits—to post CSAM, monitor user activity, and keep higher-ranking members of the site informed as to what was happening in various chat rooms.  In other words, though this defendant did not attain the same status as Rosenstein or Spearman on Website A, he very much wanted to and worked diligently in an attempt to get there.  And he did so to a greater degree than Boyles.  Accordingly, the government believes that a sentence of 330 months appropriately reflects this defendant's level of culpability.

## 2.  Comparable cases support the United States' recommendation

A review of the sentences imposed in similar cases confirms that a within-Guidelines sentence is warranted here.  In *United States v. Falte, et al.*, No. 3:17-cr-44 (M.D. Tenn.), for example, multiple defendants were—like the defendant here—involved with websites operating over the Tor network that were dedicated to the advertisement and distribution of CSAM and the discussion of child sexual abuse.  *Id.*, ECF No. 232 at 1-2.  Defendants Falte and Faulkner were organizers and leaders of such websites, and the court sentenced each to 35 years in prison.  *Id.*,

ECF Nos. 232 at 2-3, 10-13; 237 at 3; 239 at 3.[3]  Another defendant, Leslie, who created and administered another Tor network CSAM website, received 30 years in prison.  *Id.*, ECF Nos. 232 at 9; 248 at 2.  A final defendant who was a mid-level moderator on a similar website received a sentence of 20 years.  *Id.*, ECF Nos. 232 at 9-10; 250 at 3.

Administrators and moderators of other CSAM websites have received similar sentences. Defendant Lane in the case of *United States v. John Doe #1, et al.*, No. 5:10-cr-319, (W.D. La.), for example, was one of several co-administrators of a CSAM website who advertised and distributed CSAM over the site, and the court sentenced him to 30 years in prison.  *Id.*, ECF Nos. 965-2 at 1-5, 972 at 2.  Defendant Childs was a "VIP" of the same website—a rank lower than co-administrator—and likewise received 30 years in prison.  *Id.*, ECF Nos. 320-2 at 1-5; 439 at 2.

The defendant in this case is also similarly situated to the defendants in *United States v. Chase*, No. 5:15-cr-15 (W.D.N.C.).  Chase was the lead administrator of a Tor network website dedicated to CSAM.  The court sentenced him to 30 years in prison.  *Id.*, ECF No. 136 at 2. Other staff members of the website received sentences of 20 years.  *Id.*, ECF Nos. 170 at 2; 171 at 2.

The defendants listed above are similarly situated to the defendant here.  The cases cited in the defendant's sentencing position, in contrast, generally involve offenders who use peer-to-peer technologies and otherwise engaged in simple distribution, receipt, or possession of CSAM. [ECF No. 179 at 7-12, 17-21].  These cases did not involve members of technologically sophisticated child exploitation communities, much less high-ranking leaders like the defendant.

3.  The United States' recommendation is appropriate

While the aggravating factors in this case are significant, a sentence of 330 months also

---

[3]  These two defendants also engaged in the hands-on sexual abuse of a minor victim, although this was the subject of separate prosecutions and separate sentences in another district.  *See United States v. Falte*, No. 3:17-cr-49 (E.D. Va.); *United States v. Faulkner*, No. 3:17-cr-45 (E.D. Va.).

accounts for the few mitigating factors that there are—most notably, the defendant's age and acceptance of responsibility.  A 330-month sentence falls approximately within the middle of the defendant's Guidelines sentencing range of 292 to 365 months, and several years from the high end.  This range already reflects the three-point reduction under U.S.S.G. § 3E1.1 for his acceptance of responsibility and timely guilty plea, without which his Guidelines range would be even higher.  The defendant's guilty plea also allowed him to avoid a charge of engaging in a child exploitation enterprise under 18 U.S.C. § 2252A(g), which carries a higher mandatory minimum sentence, a higher statutory maximum (of life imprisonment), and likely a higher Guidelines range.

The United States also recognizes that a 330-month sentence may well be a life sentence for the defendant. Taking into account the 15% reduction in the sentence length for good-time credits, *see* 18 U.S.C. § 3624(b), a 27.5-year sentence would require the Defendant to serve more than 23 years in prison.  The defendant's age and life expectancy, however, should not outweigh the gravity of his offenses.  The defendant, while well into his later years, chose to commit exceptionally serious offenses that carry lengthy prison sentences.  No one forced him to do this.  Having chosen to dedicate the later portion of his life to criminal activity, he should not now be permitted to use his age as a shield against just punishment.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to 330 months in prison, followed by a lifetime of supervised release.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: s/ *GREGORY SCHILLER*
    Gregory Schiller
    Assistant United States Attorney
    Fla. Bar. 048477
    500 S. Australian Ave., Suite 400
    West Palm Beach, FL 33401
    Phone: 561-209-1045
    Email: gregory.schiller@usdoj.gov

STEVEN J. GROCKI
CHIEF

By: s/ *KYLE P. REYNOLDS*
    Kyle P. Reynolds
    Trial Attorney (Court ID # A5502872)

    William G. Clayman
    Trial Attorney (Court ID # A5502958)
    U.S. Dept. of Justice, Criminal Division
    Child Exploitation and Obscenity Section
    1301 New York Avenue, NW
    Washington, DC 20005
    Phone: (202) 616-2842
    Email: william.clayman@usdoj.gov
    Email: kyle.reynolds@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 17, 2023, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

<u>*s/ Kyle P. Reynolds*</u>
Kyle P. Reynolds
Trial Attorney
U.S. Department of Justice, Criminal Division